IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**RITA R. BROGAN,**                                    Case No. 3:15 CV 2427

     Plaintiff,                                    Judge James G. Carr

     v.                                    Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

     Defendant.                                    REPORT AND RECOMMENDATION

### INTRODUCTION

Plaintiff Rita R. Brogan ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. § 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated November 25, 2015). For the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

### PROCEDURAL BACKGROUND

Plaintiff protectively filed for DIB and SSI in April and June 2008, alleging a disability onset date of November 2, 2006.[1] (Tr. 150-52 (DIB); 155-57 (SSI)). Her claims were denied initially and upon reconsideration. (Tr. 82, 86, 91, 94). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 97-98). Plaintiff (represented by counsel) and a

---

1. Plaintiff had previously filed an application for DIB and SSI in June 2003, alleging a disability onset date of August 1, 2002. (Tr. 62). These applications were denied (Tr. 59-77), and Plaintiff did not appeal that decision, *see* Tr. 28.

vocational expert ("VE") testified at a hearing before the ALJ on August 23, 2010. (Tr. 42-58). On September 3, 2010, the ALJ found Plaintiff not disabled in a written decision. (Tr. 25-36). The Appeals Council denied Plaintiff's request for review. (Tr. 1-3). Plaintiff then filed an action in federal court. *See Brogan v. Comm'r of Soc. Sec.*, Case No. 12-CV-2185 (N.D. Ohio.).

On October 8, 2013, this Court recommended Plaintiff's case be remanded to determine whether *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997) was applicable, and for further consideration of the weight given to the opinion of treating psychiatrist, Dr. Satwant Gill. *Brogan v. Comm'r of Soc. Sec.*, 2013 WL 5308717 (N.D. Ohio); (Tr. 707-25). The district court adopted the report and recommendation, and remanded the case. *Brogan*, 2013 WL 5308717; Case No. 12-CV-2185 (N.D. Ohio) (Doc. 21).

On remand, the Appeals Council vacated the ALJ's decision and remanded for a new hearing and decision. (Tr. 736-40). Plaintiff (represented by counsel) and a VE appeared and testified at a hearing before an ALJ on May 29, 2014. (Tr. 974-93). In a June 18, 2014 written decision, the ALJ found Plaintiff not disabled. (Tr. 603-20). Plaintiff filed exceptions to this decision, Tr. 592-96, but the Appeals Council declined jurisdiction, Tr. 587-90[2], making the hearing decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955, 404.981.

_____

2. During the time Plaintiff's case was pending on appeal, she filed a new application for SSI benefits in May 2011. *See* Tr. 690. In the instant case, Plaintiff argued to the Appeals Council that the ALJ erred in considering the time period from May 24, 2011 through March 26, 2013 because that time period was covered by a subsequent application pending on appeal in federal court. (Tr. 592); *see also Brogan v. Comm'r*, Case No. 14-CV-714 (N.D. Ohio). The Appeals Council agreed, and noted in declining to exercise jurisdiction:

> Additionally, the Council has issued a separate notice regarding a district court remand of the claimant's subsequent application for Title XVI benefits that was filed on May 24, 2011. In this separate notice, the Council remands the subsequent claim and instructs the Administrative Law Judge to reconsider the period beginning on May 24, 2011, including any evidence relevant to this period.

2

**FACTUAL BACKGROUND**

***Personal Background and Testimony***

Plaintiff was 38 years old at her alleged onset date, and 45 years old at the time of the ALJ decision. (Tr. 150, 155). She has a high school education. (Tr. 46, 176).

*Previous ALJ Hearing*

This Court previously summarized Plaintiff's testimony at her 2010 ALJ hearing:

Plaintiff completed twelfth grade and had past work experience as a fast food worker, waitress, and commercial cleaner. (Tr. 55, 176). At the hearing, Plaintiff said she could not work because of nervousness, anxiety, and difficulties dealing with people. (Tr. 51). Plaintiff also said medication helped her mental condition (Tr. 54). Concerning daily activity, Plaintiff cleaned, cooked, watched television, went to church a few times per week, spent time with a girlfriend, and grocery shopped. (Tr. 51–52). Plaintiff claimed she had been sober for three years and had not abused drugs for seven years. (Tr. 52).

*Brogan*, 2013 WL 5308717, at *2.

*Current ALJ Hearing*

At the 2014 hearing, Plaintiff testified that her condition had not changed much since the 2010 hearing. (Tr. 979). She lives with her sister, her sister's partner, and Plaintiff's two children (aged 14 and 16). (Tr. 985). Plaintiff's sister has custody of Plaintiff's children, and her sister takes care of them and the household chores. *Id.*

Plaintiff stated she considers her mental health more limiting in terms of her ability to work than her physical health. *Id.* Plaintiff testified that being around people while working, and

---

(Tr. 588). Plaintiff notes that "[b]ecause the Appeals Council mended the ALJ's error in considering the entire period with a subsequent application, this error will not be addressed on appeal." (Doc. 17, at 4). The Court may only consider evidence that was before the ALJ. *See Matthews v. Weber*, 423 U.S. 261, 263 (1976). Because the Appeals Council remanded for consideration of the later time period, the undersigned only reviews the ALJ's decision as it related to pre-May 2011, the time period the Appeals Council determined was properly considered by the ALJ.

working generally, causes her stress. (Tr. 980). She testified that what is stressful about working is "[h]aving people tell me what to do; and having to keep up with machines; and orders; and stuff like that; and having to do so much at one time; and remembering what to do." *Id.* She testified to having trouble with motivation and getting out of bed two to three times per month. (Tr. 980-81). She has a hard time talking to people both on the phone and in person. (Tr. 981). She stays at home because being out and around people makes her nervous, stressed, and causes anxiety attacks. *Id.* She lives with her sister, and only leaves the house with her sister. (Tr. 981-82, 984). When she has an anxiety attack, she cries, gets upset, shaky, and scared. (Tr. 983). When she is nervous, she forgets things, gets slower, and misses things or makes mistakes. (Tr. 984).

Plaintiff described her typical day as getting up, making breakfast, watching television, making lunch, watching television, possibly laying down to rest, and then waiting for her sister to come home. (Tr. 985). Her sister makes supper, and then she goes to bed. *Id.* Plaintiff also testified that she had remained sober since 2007. (Tr. 986).

***Relevant Medical Evidence***[3]

This Court previously summarized the medical evidence from March 2003 through July 2010:

*Medical Evidence from the Previously Adjudicated Period*

Plaintiff went to Fulton County Health Center (Fulton) between March 20, 2003 and April 15, 2005 for mental health treatment. (Tr. 252–57, 261–65). Plaintiff sought treatment "because she fe[lt] she was having a 'nervous breakdown'". (Tr. 252). 34 years old at the time, Plaintiff reported she had been

---

3. The undersigned here summarizes only the medical evidence related to the errors Plaintiff raises. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (issues not raised in claimant's brief waived). Additionally, as noted  previously, the undersigned only reviews the time period from the alleged onset date through the date of Plaintiff's subsequent application.

4

on and off depression medication for eight years, and in and out of rehab for alcohol and drugs since she was 26 years old. (Tr. 252). Plaintiff had four young children, ages three months, three years, five years, and nine years. (Tr. 252). Her sister obtained custody of her nine year old daughter when she was an infant, and Plaintiff said she rarely saw her. (Tr. 252). Plaintiff said she drank one beer a month ago and the last time she took drugs was five years before. (Tr. 252). However, later in the interview she admitted to "popping pills left and right" over the last few weeks. (Tr. 253). She was diagnosed with major depression, recurrent; substance abuse; and assigned a global assessment of functioning (GAF) score of 25. [footnote omitted] She was referred to a partial hospitalization program. (Tr. 253).

On May 24, 2004, Plaintiff returned to Fulton and complained she was extremely overwhelmed, depressed, and felt suicidal. (Tr. 255). Notes indicated Plaintiff had "very severe legal problems with multiple arrests for drug trafficking, misdemeanor, robbery, and theft." (Tr. 255). She also had three children "who [were] in the custody of Children's Services for neglect as well as endangerment to a point of felony." (Tr. 255). Plaintiff reported she had been feeling extremely depressed since her children were taken away. (Tr. 255). She was on probation and had a court date scheduled the next day. She denied alcohol or drug use; however, she appeared groggy and tested positive for benzodiazepines. (Tr. 256). She was diagnosed with history of major depression and given Wellbutrin. (Tr. 256).

A year later, on April 14, 2005, Plaintiff presented to Fulton with suicidal ideation. (Tr. 261). She was residing at Serenity Haven pursuant to a court-ordered drug and alcohol treatment plan. (Tr. 261). She reported suicidal thoughts, explaining she was stressed out because her counselor told her she was not doing well with her treatment plan. (Tr. 261). Plaintiff had a long history of alcohol abuse, and notes indicated she drank a case of beer a day as well as large amounts of hard liquor. (Tr. 261). She reported she had a long history of using marijuana on a daily basis. (Tr. 261). Plaintiff was admitted to the inpatient unit for mental health treatment. (Tr. 263).

*Medical Evidence from Current Period*

Plaintiff saw Robert Karp, M.D., for medication management on February 6, 2007 and April 2, 2007. (Tr. 468–69, 465–66). During her February appointment, Dr. Karp discussed Plaintiff's noncompliance with laboratory testing, which Plaintiff said she could not afford. (Tr. 468). He discussed tapering and discontinuing her medication because the labs were necessary to monitor her safety. (Tr. 468). On examination, Plaintiff appeared mildly to moderately dysphoric and depressed. (Tr. 468). Dr. Karp diagnosed bipolar disorder and polysubstance dependence and prescribed a reduced amount of Lithium. (Tr. 469). Plaintiff's April 2, 2007 appointment revealed unchanged symptoms, except

she appeared in no apparent distress, her mood was mildly depressed, and she denied any thoughts of self harm. (Tr. 466).

On June 21, 2007, Plaintiff was voluntarily admitted to Defiance Regional Medical Center for feeling distraught, exhibiting pressured speech and scattered thoughts, and experiencing suicidal ideation with a plan. (Tr. 512). Plaintiff indicated her problems stemmed from not having money and not being able to see her children. (Tr. 512–13). She said she had been using marijuana frequently because she was not able to get her medication. (Tr. 513). Upon discharge, Dr. Singh noted Plaintiff's symptoms were in total abeyance and she seemed to be doing much better. (Tr. 512). He prescribed medication and instructed her to follow-up at Maumee Valley Guidance Center. (Tr. 512).

On July 2, 2007, Plaintiff saw Vinod Bhandari, M.D., at Maumee Valley Guidance Center for follow-up care. (Tr. 463–64). Plaintiff reported Seroquel helped but Lithuim was most effective in controlling her mood and depression. (Tr. 463). She was diagnosed with bipolar disorder in partial remission, polysubstance dependence, and borderline personality traits. (Tr. 463). Dr. Bhandari noted Lithium had been most useful but Plaintiff needed the proper blood tests for a prescription. (Tr. 463).

In February 2008, Plaintiff began treatment with Usha Salvi, M.D., a psychiatrist associated with Unison Behavioral Health Center. (Tr. 320–22). Plaintiff told Dr. Salvi she had been sober for 10 years but smoked marijuana six months prior. (Tr. 320). She reported receiving mental health treatment on an[d] off for years and wanted to continue treatment at Unison. (Tr. 320). Plaintiff was prescribed medication and scheduled for a psychiatric evaluation. (Tr. 321–22).

On March 17, 2008, Dr. Savli performed a full psychiatric evaluation. (Tr. 323–27). Plaintiff stated she had been experiencing symptoms of depression for the last ten years, which began when her daughter was taken away from her for the first time. (Tr. 323). Dr. Salvi noted Plaintiff's chief complaint was she "need[ed] to continue [her] meds" and she was "trying to get SSI". (Tr. 323). She said she had two sons, did well for [a]while, and worked on and off until three years ago when she was charged with child neglect and her children were taken away. (Tr. 323). She stated her biggest stressor is that she cannot see her children. (Tr. 323). She reported she was homeless and had constant negative thoughts. (Tr. 323). She was staying at Sparrow's Nest but wanted to transfer out because "she was trying to follow the rules, but it [did] not seem to be working for her." (Tr. 235). Initially, she was tearful and sobbing, but euthymic with a calmer affect later on. (Tr. 325). She reported her mood was "okay". (Tr. 325). Plaintiff admitted she had been in and out of jail for trafficking drugs and felonious assault and was released from prison one month ago. (Tr. 324). She denied hallucinations, paranoia, or manic symptoms. (Tr. 324). Her hygiene and dress were appropriate and she had good, but intermittent eye contact. (Tr. 325). Her thought process was very well organized and goal-directed. (Tr. 325). A cognitive

examination revealed Plaintiff was alert and oriented to place, person, and time; her general knowledge seemed quite adequate; her intelligence appeared average; immediate, recent, and remote memory were intact; she was able to recall 3/3 objects immediately; her concentration was fair; she displayed abstract thinking abilities; and her insight and judgment seemed fair. (Tr. 326). Dr. Salvi diagnosed Plaintiff with dysthymic disorder; major depressive disorder, recurrent, severe, without psychotic features; anxiety disorder, not otherwise specified; marijuana abuse, in early remission; and a GAF score of 55.[2] (Tr. 326). Dr. Salvi adjusted Plaintiff's medications and recommended continued counseling and AA to maintain sobriety. (Tr. 326).

Plaintiff followed-up with Dr. Salvi on April 25, 2008. (Tr. 318). She reported she was doing a lot better on her medication and she was involved in several programs, including AA, domestic violence classes, and Hope for Family. (Tr. 318). She was feeling better and not crying as much, but her depression had increased to the point she felt suicidal. (Tr. 318). Plaintiff thought this had something to do with her menstrual cycle. (Tr. 318). Dr. Salvi noted Plaintiff was more pleasant and less agitated. (Tr. 318).

On April 26, 2008, Dr. Salvi completed a Mental Functional Capacity Assessment. (Tr. 307–08). Dr. Salvi found Plaintiff was not significantly limited in her abilities to understand, remember, and carry out very short and simple instructions; sustain an ordinary routine without interruption; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; get along with co-workers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and be aware of normal hazards and take appropriate precautions. (Tr. 307). He found she had moderate limitations in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and accept instructions and respond appropriately to criticism from supervisors. (Tr. 307). Dr. Salvi specifically noted Plaintiff's grooming was appropriate, her thought process was well organized, her intelligence appeared to be average, her general knowledge was adequate, and her concentration, abstract thinking, insight, and judgment appeared to be fair. (Tr. 308). Dr. Salvi expected these limitations to last nine to eleven months. (Tr. 307).

Plaintiff was hospitalized at Flower Hospital between May 21, 2008 and May 27, 2008 for suicidal ideation, mood swings, and anxiety. (Tr. 272–301). Plaintiff's sister was interviewed during Plaintiff's hospital stay and reported Plaintiff no longer had custody of her four children, had been caught shoplifting, and was arrested and put in jail. (Tr. 289). Plaintiff's children were living with her relatives but they did not allow Plaintiff to see her children. (Tr. 289).

Upon admission, Plaintiff said she became depressed the month prior when relatives refused to let her see her children. (Tr. 293). She claimed she was having mood swings but denied psychotic systems. (Tr. 293). Dr. Cao noted

Plaintiff was cooperative and her affect was appropriate but sad. (Tr. 293). Her speech and rhythm were normal, her thought process goal-directed, she denied hallucinations or delusions, she was alert and oriented, her memory was intact, and she denied homicidal ideation. (Tr. 293). She did have suicidal ideation with a plan. (Tr. 293). Dr. Cao diagnosed bipolar disorder and a GAF score of 30. [footnote omitted] (Tr. 293–94). Upon discharge, Dr. Cao found Plaintiff's mood was better, she denied any suicidal or homicidal ideation, and there was no evidence of psychosis. (Tr. 272). Plaintiff was discharged with instruction to follow-up with Dr. Salvi. (Tr. 273).

On June 3, 2008, Plaintiff saw Dr. Salvi and reported she had been "'PMSing' and became suicidal." (Tr. 313). She requested to be transferred to the Woodruff Clinic under the care of Dr. Gill. (Tr. 313). Again, she reported her menstrual cycle sparked suicidal thoughts and caused her to go to the hospital. (Tr. 313). Plaintiff said she was better after Dr. Cao changed her medications. (Tr. 313). She told Dr. Salvi she was staying with a friend where there was no stress, and no rules or regulations. (Tr. 313). She said she had been sober for nine months and was in a drug and substance abuse program. (Tr. 313–14). Dr. Salvi noted Plaintiff planned to treat with Dr. Gill in the future. (Tr. 315).

On July 21, 2008, state agency psychologist Caroline Lewin, Ph.D. completed a Mental Residual Capacity Assessment. (Tr. 376–80). Dr. Lewin adopted the mental RFC from the prior ALJ's decision dated December 8, 2006 under the *Drummond* Ruling because she found there was no new or material change in Plaintiff's condition. (Tr. 378); *See* AR 98–4(6), 1998 WL 283902, at ("SSA may not make a different finding in adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim unless new and additional evidence or changed circumstances provide a basis for a different finding of the claimant's residual functional capacity."). State agency professional Karen Terry, Ph.D. affirmed Dr. Lewin's opinion on January 9, 2009. (Tr. 446).

Plaintiff began seeing Dr. Satwant Gill on August 14, 2008. (Tr. 414). She requested the transfer of care because Dr. Gill was closer to where she lived. (Tr. 414). Plaintiff told Dr. Gill she had a history of depression and mood swings. (Tr. 414). She also said she used to drink and use marijuana, and "for several reasons" her children were taken away from her. (Tr. 414). Plaintiff reported she was doing better than before she went to the hospital in May 2008 and was sleeping fairly well, but she still experienced crying spells and felt moody and irritated at times. (Tr. 415). Plaintiff claimed she had been clean for over a year with no consumption of drugs or alcohol. (Tr. 415). She was trying to do better so she could get her children back. (Tr. 415). Plaintiff denied auditory or visual hallucinations, paranoid, homicidal, or suicidal ideations. (Tr. 415).

On examination, Plaintiff was alert and oriented, dressed neatly, cooperative, and her speech was soft and non-pressured. (Tr. 416). Some lability

of mood was noted, and she seemed anxious and irritated initially, but relaxed as the appointment progressed. (Tr. 416). No overt delusional thinking was noted, she was in no acute distress, and she did not appear to be an immediate danger to herself or others.

Plaintiff followed-up with Dr. Gill on October 23, 2008. (Tr. 412). She reported her medication helped her mood and sleep pattern. (Tr. 412). She said her boyfriend passed away, which caused her to feel emotional, but she had been feeling better. (Tr. 412). She denied current use of alcohol, marijuana, or any illicit substances. (Tr. 412). She also denied suicidal or homicidal ideations. (Tr. 412). On examination, her mood and affect were stable, no lability of mood was noted, no thought disorder noted, she was not in any immediate danger to herself, and she wanted to continue her current medications. (Tr. 412).

Plaintiff continued treatment with Dr. Gill between January 8, 2009 through May 28, 2010. (Tr. 477–82, 486–87, 491–92, 495–98, 500–02, 504–06). On each occasion, Plaintiff denied manic symptoms, auditory or visual hallucinations, alcohol or drug use, and suicidal or homicidal ideation. (Tr. 477, 479, 481, 486, 491, 495, 497, 500, 504). She was always alert, oriented and cooperative (Tr. 477, 479, 481, 486, 491, 495, 497, 500, 504), and her mood was generally stable (Tr. 477, 479, 481, 486, 491, 495, 497). During her first few visits, Plaintiff told Dr. Gill she was having crying spells; however, at the same time, Plaintiff denied suicidal ideation, and she was alert, oriented and cooperative. (Tr. 500, 504). After those initial visits, Plaintiff's mood was stable. (Tr. 477, 479, 481, 486, 491, 495, 497). And by 2009 and 2010, Plaintiff denied depression (Tr. 477, 479, 481) and mood swings (Tr. 477, 479, 481, 486), and said her medication was helping (Tr. 477–78, 479, 481, 486, 491, 495, 497).

On July 23, 2010, Dr. Gill completed a form titled "Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment." (Tr. 510–11). Dr. Gill checked boxes indicating Plaintiff had less than moderate limitations [footnote omitted] in her ability to remember, understand, and follow simple directions, and interact appropriately with others. He found Plaintiff had moderate limitations in her ability to maintain attention and concentration for two-hour periods of time, perform work activities at a reasonable pace, keep a regular work schedule and maintain punctual attendance, withstand the pressures of routine simple unskilled work, and make judgments that commensurate with the functions of unskilled work. (Tr. 510–11). Moderate limitations was defined as: "An impairment which seriously interferes with, and in combination with one or more other restrictions assessed, may preclude the individual's ability to perform the designated activity on a regular and sustained basis." (Tr. 510).

*Brogan*, 2013 WL 5308717, at *2–6 (footnotes omitted).

9

In August 2010, a progress note from Unison stated Plaintiff reported "doing well". (Tr. 887). She had sufficient concentration, appropriate speech, stable and controlled mood, organized thought process, and was pleasant and cooperative. *Id.* The nurse noted she was not a danger to herself or others, and was accepting of intervention. *Id.*

Plaintiff met with Dr. Gill again in September 2010, December 2010, and January 2011. (Tr. 888-89, 891-92, 893-94). Plaintiff reported a stable mood (Tr. 888) and that she was doing well (Tr. 888, 891, 893). Dr. Gill noted on examination that Plaintiff's mood and affect were stable, no lability of mood was noted, she was not in any acute distress, and she did not appear to be a danger to herself or others. (Tr. 888, 891, 893). In September 2010, Dr. Gill's treatment notes state that Plaintiff's "grandma had passed away within the last couple of weeks, but her family was all together, so she handled it well." (Tr. 888).

Plaintiff continued to be seen at Unison through 2014. (Tr. 884-949). In April 2014, K. Roger Johnson, M.Ed., performed a psychological evaluation at the request of the state agency. (Tr. 970-74). Finally, in May 2014, Dr. Gill wrote a letter stating Plaintiff is '"unable to work or engage in any meaningful earning activities due to her symptoms from her psychiatric illness. (Mood lability, depression, irritability, and anxiety)." (Tr. 973).

### *VE Testimony, ALJ Decision & Appeals Council Decision*

*VE Testimony*

The ALJ asked the VE to assume a hypothetical person with Plaintiff's age, education, and vocational background. (Tr. 988). He asked the VE to assume this person "[h]as the residual functional capacity for work at the light exertional level; except that the hypothetical individual were best in an environment without closely regimented pace; or production; or without close

supervisory scrutiny." *Id.* The VE testified such an individual could work as a folder, production inspector, or cleaner. (Tr. 988-89).

In a second hypothetical, the ALJ then added restrictions of:

occasional climbing of ladders; ropes; and scaffolds; occasional kneeling; frequent crouching; no crawling; work with an SVP level of 1; or 2; with a pace of productivity is not dictated by an external source over which the claimant has no control, such as an assembly line; or conveyor belt; occasional contact with the general public; and occasional contact with supervisory authority.

(Tr. 989). The VE testified the three jobs previously listed would still be available. *Id.*

Finally, in a third hypothetical the ALJ added restrictions of

Occasional climbing of ramps; and stairs; occasional balancing; stooping; kneeling; crouching; no crawling; work limited to simple; routine; and repetitive tasks in a work environment free from fast-paced production requirements, such as moving assembly lines; and conveyor belts; involving only work related decisions with few, if any, work place changes; occasional interaction with the general public; coworkers; and supervisors.

(Tr. 990). The VE again testified that the three jobs previously listed would still be available. *Id.*

Plaintiff's counsel asked the VE to consider treating physician Dr. Gill's opinion that Plaintiff would be moderately limited in five areas of functioning (with "moderately limited" described as "an impairment which seriously interferes with, and then in combination with one or more restrictions, may preclude the individual's ability to perform the designated activity"). (Tr. 991). The VE testified such a restriction would eliminate employment. (Tr. 992).

*ALJ Decision*

In a written decision dated June 18, 2014, the ALJ found Plaintiff: 1) meets the insured status requirements of the Social Security Act through March 31, 2010; 2) has not engaged in substantial gainful activity since November 2, 2006, the alleged onset date; 3) has severe impairments of depressive disorder, bipolar disorder, mild degenerative disc disease of lumbar spine, minimal degenerative joint disease bilateral knees, and obesity; 4) does not have an

11

impairment or combination of impairments that meets or medically equals the severity of the

listings; and 5) retains the residual functional capacity to perform light work except:

> Postural limitation occasional climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching; no crawling. Work limited to simple, routine and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work related decisions, with few if any work place changes. Occasional interaction with the general public, coworkers, and supervisors.

(Tr. 605-09). The ALJ concluded Plaintiff was unable to perform any past relevant work; and

considering Plaintiff's age, education, work experience, and residual functional capacity, there

were jobs that existed in significant numbers in the national economy that she could perform.

(Tr. 618-19)

> *Appeals Council*

> In declining to exercise jurisdiction, the Appeals Council stated:

> Specifically, we conclude that the Administrative Law Judge's decision adequately complies with the court remand. The Administrative Law Judge re-evaluates Dr. Gill's July 2010 opinion, and provides adequate rationale to give this opinion "little weight" (Decision, pages 14-15). Thus, since the Administrative Law Judge did not rely on this opinion to find the claimant "not disabled," there is no conflict with the vocational expert testimony. The Council concludes that the exceptions do not warrant the Council assuming jurisdiction in this case. The Administrative Law Judge adequately evaluates and weighs the medical opinions in the record, including opinions from the claimant's treating source Usha Salvi, M.D., and examining source K. Roger Johnson, M.Ed. (Decision, pages 10-11, 15).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply

the correct legal standards or has made findings of fact unsupported by substantial evidence in

the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial

evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

4.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises two related objections to the ALJ's decision: 1) that he failed to provide good reasons for the weight given to the opinions of treating psychiatrists; and 2) he relied on his own evaluation of the evidence, rather than that of the medical experts.

### *Treating Physician*

Plaintiff's first argument implicates the well-known treating physician rule. Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent

14

with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544.

When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011); *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009). The Sixth Circuit has held that an ALJ may also give "good reasons" by challenging the supportability and consistency of the treating physician's opinion in an "indirect but clear way", *Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 625 (6th Cir. 2010), or "implicitly provid[ing] sufficient reasons for not giving those opinions controlling weight, and indeed for giving them little to no weight overall", *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 472 (6th Cir. 2006). Addressing an opinion's

supportability and consistency with the record as a whole is sufficient. *See Henke v. Astrue*, 498 F. App'x 636, 640, n.3 (7th Cir. 2012); *Benneman v. Comm'r of Soc. Sec.*, 2012 WL 5384974, at *1 (N.D. Ohio).

*Dr. Gill*

Plaintiff specifically objects to the ALJ's analysis of Dr. Gill's July 2010 opinion. In that opinion, Dr. Gill noted Plaintiff would be "moderately limited" in her abilities to: 1) maintain attention and concentration for two hour periods of time; 2) perform work activities at a moderate pace; 3) keep a regular work schedule and maintain punctual attendance; 4) withstand the stresses and pressures of routine simple unskilled work; and 5) make judgments that are commensurate with the functions of unskilled work, i.e., make simple work-related decisions. (Tr. 510-11). The form opinion defined "moderate limitation" as "[a]n impairment which seriously interferes with, and in combination with one or more other restrictions assessed, may preclude the individual's ability to perform the designated activity on a regular and sustained basis." (Tr. 510).

The ALJ summarized Dr. Gill's findings and then addressed them as follows:

The undersigned finds the evidence of record does not support this medical opinion of Dr. Gill. On June 20, 2010, [a] nurse's progress note show[ed] that the claimant had good hygiene. She was oriented times four and she was alert. She had sufficient concentration and her mood was stable. Her thought process was organized and she was cooperative. She denied any perceptual disturbances and she denied danger [citing Tr. 884]. Later, on December 3, 2010, Dr. Gill noted that the claimant was dressed neatly and she was alert and oriented. She was cooperative and her mood and affect was stable. No lability of mood was noted and she had no formal thought disorder. She was not seen to be in any acute distress. She did not seem to be in any immediate danger to herself or others [citing Tr. 891]. The undersigned finds that the evidence of record does not support that the claimant was seriously limited and precluded in the above-mentioned activities. Therefore, the undersigned gives little weight to the medical opinion of Dr. Gill.

(Tr. 617). Plaintiff contends that the "reference to two treatment notes is not 'good reason' for rejecting the opinion of the long-term treating psychiatrist." (Doc. 17, at 11). The Commissioner responds that Dr. Gill's opinion "lacked support and was inconsistent with the record as a whole" including being "directly at odds with his own treatment notes and observations during mental status examinations." (Doc. 20, at 11). The undersigned agrees with the Commissioner and finds the ALJ satisfied the reason-giving requirement.

Although the ALJ cited only two treatment notes, those notes are from the time period surrounding Dr. Gill's July 2010 opinion—one before (June 2010), and one after (December 2010). Discounting a treating physician's opinion based on inconsistent contemporaneous treatment notes is reasonable. *See Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 177 (6th Cir. 2009) (finding treating physician rule not violated in part where: "the record also supports the ALJ's conclusion that [the treating physician's] opinion was inconsistent with his own prior assessments and treatment notes"); *Jackson v. Comm'r of Soc. Sec.*, 2016 WL 1211425, *6 (W.D. Mich.) ("This statement was inconsistent with . . . contemporaneous treatment notes that stated Plaintiff was 'doing very well' and was 'alert, cooperative, and oriented' with satisfactory memory.").

The June 2010 nurse's progress note referenced by the ALJ noted Plaintiff's physical appearance was good; she was oriented to person, place, time, and events; she was alert; her concentration was sufficient; her mood was stable; her thought process was organized; and she was cooperative. (Tr. 884). The December 2010 note from Dr. Gill stated Plaintiff "related she has been doing well on the medicines." (Tr. 891). He noted she was "[a]lert and oriented"; "[c]ooperative"; "[m]ood and affect stable"; "[n]o lability of the mood noted"; "[n]o formal thought disorder noted"; and "[s]he was not seen to be in any acute distress . . . [or] in any

17

immediate danger to herself or others." *Id.* He recommended Plaintiff continue her current medication regime, follow up with the nurse in five weeks, and follow up with Dr. Gill in nine weeks (or as needed before that). (Tr. 892). Moreover, other treatment notes from Dr. Gill from the time period leading up to his opinion similarly support that Plaintiff was stable and doing well on medication. (Tr. 477 (May 2010), 479 (March 2010), 481 (January 2010), 486 (November 2009), 491 (July 2009), 495 (May 2009), 497 (March 2009)). The same is true for other notes after that time period. (Tr. 888 (September 2010), Tr. 893 (January 2011)). Thus, the undersigned finds it was reasonable for the ALJ to give "little weight" to Dr. Gill's July 2010 opinion that Plaintiff was more severely limited. *See Price*, 342 F. App'x at 177; *Jackson*, 2016 WL 1211425, *6. The ALJ's reasons were "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544. The ALJ's opinion addressed the consistency and supportability of Dr. Gill's opinion. *See Henke*, 498 F. App'x at 640, n.3; *Benneman* 2012 WL 5384974, at *1. Although Plaintiff points to contradictory evidence in the record, as noted above, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

       *Dr. Salvi*

       Similarly, the ALJ did not err in his evaluation of Dr. Salvi's opinion.[4] Specifically, the ALJ noted Dr. Salvi's opinion was inconsistent with his own contemporary treatment notes, a

---

4. Plaintiff focuses her challenge on Dr. Gill's opinion and only briefly summarizes Dr. Salvi's opinion. (Doc. 17, at 12-13). It is unclear if she intends a separate challenge to the ALJ's evaluation of Dr. Salvi's opinion. The undersigned notes that underdeveloped arguments are considered waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation,

valid reason for giving his more restrictive opinion less weight. *See Price*, 342 F. App'x at 177; *Jackson*, 2016 WL 1211425, *6.

### RFC Determination

Plaintiff's second argument is that the ALJ's RFC determination lacks foundation because it is not based on medical opinion. The Commissioner responds that the ALJ reasonably formulated an RFC based on the various medical opinions in the record. The undersigned finds no error in the ALJ's determination.

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. *Id.* § 404.1529. An ALJ must also consider and weigh medical opinions. *Id.* § 404.1527. Although "[i]t is well established that the ALJ may not substitute his medical judgment for that of the claimant's physicians", *Brown v. Comm'r of Soc. Sec.*, 2015 WL 1431521, *7 (W.D. Mich.) (citing *Meece v. Barnhart*, 192 F. App'x 181, 194 (6th Cir. 2009)), "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009); *see also* 20 C.F.R. § 404.1527(d)(2) ("Although we consider opinions from medical sources on issues such as [a claimant's RFC] . . . the final responsibility for deciding these issues is reserved to the commissioner").

An RFC determination is not the duty of a claimant's physicians; instead this determination is exclusively within the purview of the Commissioner. *Edwards v. Comm'r of*

---

are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (citation and internal quotation omitted).

*Soc. Sec.*, 97 F. App'x 567, 569 (6th Cir. 2004); *see also* SSR 96-5p, 1996 WL 374183, *5 ("Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the [RFC] assessment."); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) ("To require the ALJ to base her RFC finding on a physician's opinion, 'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'") (quoting SSR 96-5p, 1996 WL 374183, at *2); *Henderson v. Comm'r of Soc. Sec.*, 2010 WL 750222, *2 (N.D. Ohio) ("[T]he ALJ is charged with evaluating several factors in determining the RFC, including the medical evidence (not limited to medical opinion testimony), and the claimant's testimony.").

As required by the regulations, the ALJ here evaluated all the evidence of record in formulating Plaintiff's RFC. *See* Tr. 609-17. He acknowledged her mental limitations in limiting her to "simple, routine, and repetitive tasks"; no "fast paced production requirements"; "few if any work place changes"; and only "occasional interaction with the general public, coworkers, and supervisors." (Tr. 609). He acknowledged her testimony that she has difficulty handling stress and being around other people, as well as quota or speed demands at work, such as while waitressing. *Id.* He summarized Plaintiff's medical treatment from 2006 onward. (Tr. 610-17). Specifically, the ALJ evalutated treating psychiatrist Dr. Salvi's opinion. (Tr. 612). Although the ALJ ultimately gave that opinion "some limited weight" (Tr. 613), he thoroughly discussed why he found Plaintiff less limited than opined by Dr. Salvi based on the doctor's own treatment notes (Tr. 612-13).

The ALJ also discussed the two hospitalizations Plaintiff had during the relevant time period. *See* Tr. 610 (discussing June 2007 hospital admission); 613 (discussing May 2008 admission). During each of these admissions, Plaintiff showed improvement with medication adjustment. *See* Tr. 512 (discharge note stating "[w]ith adjustments in her medications and medication dose, she has done progressively well . . . . [and] [t]he target symptoms . . . appear to be in total abeyance at the present time"); Tr. 272 (discharge note stating "[d]ose of Seroquel was increased and Wellbutrin SR was added" and Plaintiff's "mood was better"; "[s]he denied any suicidal or homicidal ideations"; and "[t]here was no psychosis."); Tr. 313 (treatment note from Dr. Salvi after May 2008 hospitalization noting Plaintiff was "doing better" on the new medications).

The ALJ also evaluated Plaintiff's testimony and alleged limitations, finding them not fully credible. (Tr. 615-16). Credibility evaluations are within the purview of the ALJ. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1234 (6th Cir. 1993).

Additionally, as discussed above, the ALJ gave good reasons for giving Dr. Gill's opinion about Plaintiff's limitations "little weight", notably its inconsistency with Dr. Gill's own records. (Tr. 617).

Finally, the ALJ also reasonably relied on the fact that Plaintiff's mental condition improved when an effective medication regimen was established. *See Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 367 (6th Cir. 1984) ("The medical evidence reflected that appellant's impairments were controlled with medication[.]").

As noted above, the ALJ was not required to rely solely on medical opinion evidence to formulate his RFC. *See Rudd*, 531 F. App'x at 728; *Poe*, 342 F. App'x at 157; *Henderson*, 2010

WL 750222, at *2. Accordingly, having reviewed the entire record, and the ALJ's decision, the undersigned finds the ALJ's RFC determination supported by substantial evidence. Moreover, the Court notes that it reviews the ALJ's RFC assessment not for complete or exact correlation between the evidence and the ALJ's findings, but for legal error or lack of substantial supporting evidence. Finding neither in this case, the undersigned recommends the ALJ's RFC determination be affirmed.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned recommends the Commissioner's decision be affirmed.


 s/James R. Knepp II
United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).